```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -
        MEDICIS PHARMACEUTICAL CORPORATION,
 4      et al.,                              :    CIVIL ACTION NO.
                      Plaintiffs,            :
 5                                           :
                   v.                        :
 6                                           :
        ACTAVIS MID ATLANTIC LLC,            :
 7                                           :    11-409-LPS-CJB
                      Defendant.             
 8                               - - -

 9                          Wilmington, Delaware
                          Friday, September 28, 2012
10                          Telephone Conference

11                               - - -

12      BEFORE:  HONORABLE CHRISTOPHER J. BURKE, U.S. Magistrate Judge

13      APPEARANCES:              - - -

14
                   MORRIS NICHOLS ARSHT & TUNNELL, LLP
15                 BY:  JACK B. BLUMENFELD, ESQ., and
                        JENNIFER YING, ESQ.
16
                        and
17
                   GIBSON DUNN & CRUTCHER
18                 BY:  MICHAEL A. SITZMAN, ESQ., and
                        LAUREN A. EBER, ESQ.
19                      (San Francisco, California)

20                      Counsel for Plaintiffs

21
                   PROCTOR HEYMAN, LLP
22                 BY:  DOMINICK T. GATTUSO, ESQ.

23                      and

24
                                  Brian P. Gaffigan
25                                Registered Merit Reporter
```

```
 1    APPEARANCES:  (Continued)

 2
                   ALSTON & BIRD
 3                 BY:  JOSEPH J. GLEASON, ESQ.
                        (Atlanta, Georgia)
 4
                              Counsel for Defendant
 5

 6

 7

 8

 9

10

11

12

13

14                          - oOo -

15                    P R O C E E D I N G S

16            (REPORTER'S NOTE:  The following telephone

17    conference was held in chambers, beginning at 3:01 p.m.)

18            THE COURT:  Good afternoon, everybody.  This is

19    Judge Burke.  Could the parties let me know who is on the

20    line, first for the plaintiffs?

21            MR. BLUMENFELD:  Good afternoon, Your Honor.

22    It's Jack Blumenfeld and Jen Ying from Morris Nichols with

23    Mike Sitzman and Lauren Eber from Gibson Dunn.

24            THE COURT:  Okay.  Good afternoon to all of you.

25            MR. BLUMENFELD:  Good afternoon.
```

1                    MR. SITZMAN:  Good afternoon, Your Honor.

2                    THE COURT:  Who is on for the defendant?

3                    MR. GATTUSO:  Good afternoon, Your Honor.

4    Dominic Gattuso from Proctor Heyman.  With me on the line

5    is Joe Gleason from Alston & Bird on behalf of Actavis.

6                    THE COURT:  Good afternoon to you both as well.

7                    MR. GATTUSO:  You as well.

8                    THE COURT:  We're on the record here for a

9    teleconference to resolve certain discovery disputes in the

10   matter of Medicis Pharmaceutical Corporation, et al v Actavis

11   mid-Atlantic LLC.  It's Civil Action No. 11-409-LPS-CJB here

12   in this court.  Because we're on the record, I have with me a

13   court reporter from Judge Stark's chambers here with me today,

14   and he will take down today's call.  I'd ask, as I always do,

15   if counsel, as they have already, would indicate who they are

16   before they speak so we get a good record of today's transcript.

17                   Also, I will apologize up front.  I have a

18   pretty bad cold so my voice may be a little bit hard to

19   hear.  I apologize for that.  I'll try to speak up as best I

20   can.

21                   I know we had, there are a number of issues that

22   were raised in the parties' respective letter briefs.  I

23   think I counted seven total, depending on how you count.  I

24   thought it might make sense to start with what really isn't

25   in dispute any more, which I'm hoping is at least, I think,

1    at least three of those issues, maybe more.

2            So let me just touch base on a couple things

3    that I'm wondering whether they're even still issues and let

4    the parties tell me if we have anything left in dispute.

5            One is, and I'm going to butcher this name but

6    Hafrun Fridiksdottir, Actavis's Vice President of Research

7    and Development, the issue with respect to the deposition

8    there.  It sounded like after the letters from the parties,

9    there wasn't an issue as to whether there was going to be a

10   deposition.  There was just some discussion about dates.

11           Have the parties resolved that issue or, in

12   light of what is represented, will they be resolving it on

13   their own?

14           MR. SITZMAN:  Your Honor, it's Mike Sitzman for

15   the plaintiffs.

16           That situation has been resolved.

17           THE COURT:  Good.  Thanks.  So the next issue I

18   thought was resolved was the issue regarding Dr. Dow's

19   deposition.  Has that also been resolved since the letters

20   were submitted?

21           MR. GLEASON:  Your Honor, this is Joe Gleason

22   for Actavis.

23           That issue is also resolved.

24           THE COURT:  The issue with respect to production

25   of a copy of the NDA and MB781.  I understand plaintiffs

1    produced those documents, and my thought that was also

2    resolved as well; is that correct?

3                MR. GLEASON:  Your Honor, this is Mr. Gleason

4    again.

5                We have received those productions; and we

6    believe that issue is resolved.

7                THE COURT:  Great.  Moving right along.

8                That leaves kind of four issues or four sets

9    of issues.  By that, I mean discovery relating to other

10   topical gel products of Actavis, which I know has two prongs

11   to it:  the issue of whether a 30(b)(6) witness could be

12   compelled with regard to secondary considerations, and the

13   issue of compelling production of certain employee witnesses

14   that have been requested by defendant to testify.  Those

15   issues I thought were likely to still be live, along with

16   the issue of redacted documents such as lab notebooks.  So

17   that was four in total.

18               Are all four of those issues still disputed or

19   has any one of those been resolved?

20               MR. SITZMAN:  Your Honor, it's Mike Sitzman for

21   the plaintiffs.

22               The only one I think of those four that have

23   been resolved or at least should be tabled at this point is

24   the redacted documents.  Now that we have this chart from

25   the defendants, we are reviewing each of those.  We've made

1    a commitment in the letter that we will produce unredacted

2    versions of any documents we think were overredacted by

3    October 5th.  We should be able to do that very quickly.

4         Otherwise, we'll be fighting over an issue I

5    don't think is quite ripe.  I think it was indicated already

6    in the defendant's letter that this was something that was

7    currently being discussed amongst the parties anyway.

8         THE COURT:  Mr. Gleason, I know part of your

9    answer may be that, well, gee, it depends on what we get

10   back.  But from the perspective of trying to be efficient

11   about what it is we're addressing and what it is we're not,

12   my inclination is to see whether there can be a resolution

13   here in light of what the plaintiffs have proposed.

14        Do you have an objection to tabling that issue

15   at this time?

16        MR. GLEASON:  Your Honor, I do.  My objection

17   is this issue was first raised in October during Dr. Dow's

18   deposition.  The parties have been discussing it since then.

19   The plaintiffs have taken the position that their redactions

20   are proper, and we think they're not.

21        I think that it may not be beneficial for the

22   parties to go through every single redaction on this call, but

23   I think it would be beneficial to discuss at least some of

24   them so that the parties can get some guidance as to how the

25   Court sees this redaction issue.  I think if we do at least a

1    couple of the redaction issues that have been presented, that

2    might inform the plaintiffs as they filter through the rest of

3    the redactions.

4                 THE COURT:  I guess, Mr. Sitzman, the question

5    for you there is, I mean part of this, if what you are

6    telling me is that you think it is extremely likely that

7    when you go back, having gotten this list, you are likely

8    to produce an unredacted form of all of the documents that

9    they're asking to be unredacted, if you represent that to

10   me, then I'm not going to deal with the issue now because

11   my view is going to be this is probably not an issue at all.

12   But if what you are telling me, if what you are saying is

13   the current state of affairs is we've gotten this request,

14   we promise we'll take a look at it, I can't promise you that

15   we're going to redact all or some or anything, we'll just

16   have to see, then I'm inclined to at least have some

17   discussion about it on today's call.

18                 Which of those two camps would you say you fall

19   into at this stage?

20                 MR. SITZMAN:  Thank you, Your Honor.  It is the

21   latter camp, Your Honor.

22                 First of all, I do want to respond real quickly.

23   We've been asking for awhile now, since mid-August or

24   otherwise, for a list of these documents.  We've got one

25   list that included a bunch of pages that actually had been

1    produced unredacted, and we asked the defendants to provide

2    us with a specific list and the only list they've provided

3    is the one we got with their motion.

4            We have started to go through them so that we

5    could make a production, if necessary, by October 5, as

6    we've said in our letter.  I can tell you that some documents

7    will be produced unredacted, but we've already seen some of

8    them being properly redacted, and so I think we fall into

9    that latter camp.  It will not be the case that there will

10   be no change in our production.  I can tell you that so far.

11           THE COURT:  Well, in light of that, and in light

12   of the fact that it looks like all we would be doing by not

13   discussing this at all is simply kicking down the line an

14   issue that is still live, I'll at least hear argument on

15   that issue and give some initial thoughts.  I'm not sure

16   I'll be able to resolve the entirety of it but we can at

17   least discuss it.

18           Actually, while we're there, why don't we take

19   the issue up now and then we'll deal with the remaining

20   three issues after that.  Mr. Gleason, I think this comes

21   out of your motion.  Would you like to provide any

22   additional brief argument with regard to your position?

23           MR. GLEASON:  Yes, Your Honor.  I think that

24   one of the things that we're seeing is, if you look at

25   Notebook 317, which I believe is Exhibit IA, to our initial

1    letter.  One of the things you are seeing is that there are

2    redactions at the level of the table of contents, and that

3    is true of the other notebooks as well.

4         We have kind of a fundamental problem with that.

5    The reason is that when that table of contents is redacted,

6    it prevents us from making any determination as to whether

7    the redaction of the actual page was or was not appropriate

8    because we have no idea what the content of the page is.

9         Now, as the plaintiffs indicated in their letter,

10   Actavis has also made some redactions from the notebooks that

11   it produced.  It is the case that both parties have separate

12   projects being discussed in the same notebook.

13        What Actavis has done, though, is to produce

14   unredacted copies of the table of contents, and then there

15   will be pages redacted from the production, but the

16   plaintiffs can look at our notebooks and see that page 17

17   is missing and then go see one page 17 has to do with a

18   quipazine drug and it's entirely unrelated.  We can't do

19   that with their notebooks, so we're sort of flying blind.

20   Because as you can see from the table contents from Notebook

21   317, that is all missing.

22        The other thing that we can see from the Notebook

23   317 is that in some cases they have not redacted the table of

24   contents and what is missing from there is something that

25   looks to be clearly relevant.  We have experiments concerning

1    the stability of a ClinRA solution.  We have experiments

2    regarding the solubility of tretinoin and experiments

3    regarding vehicle formulations and physical evaluations and

4    things like that, that all look to be clearly relevant.

5                What may be happening here is that there are --

6    at least we can tell from the table of contents of this

7    notebook that it looks like there may be some discussions of

8    a slightly different formulation of the Ziana product that

9    is at issue here, and it may be that some of the redactions

10   are because the formulation that is being redacted includes

11   an oil phase, which means it is a lotion instead of being

12   purely a gel.  But, frankly, the patent discusses a lotion.

13   There is a divisional patent that specifically claims the

14   lotion.

15               I think that plaintiffs are drawing the line and

16   saying, well, if we're talking about the lotion, that is not

17   relevant.  We think that is improper.

18               We also think there are, in some of these other

19   notebooks, there are redactions in the middle of the page.

20   The experiment is clearly relevant.  They've produced almost

21   all of it, but we'll see in the notebooks that they're talking

22   about, one of the drugs that is discussed in the patent is a

23   drug called Clinagel, and there will be experiments that say

24   comparison of Clinagel to X, and X is redacted.  I don't

25   understand any support for that.

1          So I think what I would ask the Court to do

2    is order that at least by -- rather than go through every

3    one of these, if the Court could resolve the issue of

4    whether related formulations are or are not relevant to the

5    extent they have the key gelling agents and the key

6    ingredients -- we think they're relevant -- and even if the

7    plaintiffs somehow deem that to be a separate project?  And,

8          Then the other thing is, you can't do redactions

9    in the middle of a page.  And,

10          Then the last piece of guidance that we would

11   ask the Court to provide us is for unredacted copies for at

12   least the table of contents so that we can then make an

13   intelligent determination about whether the rest of the

14   pages that have been redacted were or were not appropriately

15   redacted.

16          THE COURT:  Can I ask, in terms of the list

17   that you have provided to them, what is the scope of the

18   documents on that list?

19          MR. GLEASON:  There are four lab notebooks

20   included on that list.  There is a fifth document that is a

21   licensing agreement.  It's actually an amendment to a

22   licensing agreement between Medicis and Dow concerning the

23   '383 patent.

24          THE COURT:  So we're talking about a relatively

25   cabined amount of documents that are at issue.

 1             MR. GLEASON:  Yes.

 2             THE COURT:  Mr. Sitzman, do you want to respond

 3    to what I call the general areas of concern that Mr. Gleason

 4    raised?  You can talk about whatever you want but, first, do

 5    you want to talk about the table of contents issue?

 6             MR. SITZMAN:  Yes.  Thank you, Your Honor.  I do

 7    want to speak to it generally only because I don't have the

 8    unredacted version of things in front of me here.

 9             The redactions that have taken place, which

10    are in line with what Actavis has done as well, deal with

11    proprietary products that are either currently under

12    development or that relate entirely to something completely

13    different, including matters that are, as counsel already

14    admitted, related to a totally separate patent that is not

15    part of this lawsuit.  They do not relate to different

16    formulations of the same product.

17             Keep in mind this is, at least on our end

18    being the patentee, these are formulations of what we would

19    otherwise consider embodiments of the patented invention

20    which take on a broad scope; but they're not different

21    formulations of the same invention, they are different

22    products altogether.

23             I think I heard Mr. Gleason suggest that even

24    if they were different products but they had some of the

25    same ingredients, or something to that effect, he thinks

1    nevertheless he should have those.  I don't think that is

2    fair.  I don't think that is right.  That is certainly not

3    the position that he has taken with regard to Actavis's

4    products or Actavis's products that they've had in development

5    that share some of the same elements or some of the same

6    ingredients.

7         The table of contents in particular describes

8    specifically what those new and different products are.

9    They've been redacted for proprietary purposes.

10        I don't think that describing, you know,

11   allowing the unredacted versions of our products under

12   development is appropriate, especially when they have

13   nothing to do with the patent at issue.

14        I also heard Mr. Gleason suggest that, well,

15   if they could just see what it was, then they know they

16   could check it off.  I don't think that is a proper measure

17   either.  It sounds similar to the situation where you are

18   talking about a privileged document which is if I could

19   see the privileged document, then I would know if it was

20   privileged.

21        I think both sides have a duty and an obligation,

22   and I think there is a good faith obligation on both sides

23   that they've redacted things and products that have nothing

24   to do with this case and that are not related to the patent at

25   issue.  We've taken the redactions that Actavis has given on

1     face value.  We would ask that they do the same.

2              However, I can tell you, as I alluded to earlier,

3     there are some pages that we do believe that we can produce in

4     an unredacted form because either there is no concern or issue

5     about that particular product or item or it's something that

6     is something that is dead, it's not a current item or a

7     current issue or something that there is no interest in.  And,

8     frankly, I think we can just resolve that issue.  I would

9     rather resolve it than fight about it.

10             THE COURT:  The redactions that are in the current

11    version, are these redactions made due to the material in

12    plaintiffs' view not being relevant or not being relevant and

13    being proprietary/trade secrets or for some other reason?

14             MR. SITZMAN:  It's the latter.  It is not

15    relevant but, more importantly, it is proprietary and trade

16    secret.  I mean it is.  One of the things, to just kind

17    of highlight, is the reference that counsel made to this

18    other phase of a product, an oil-phased product.  That is

19    something that is proprietary.  It is something that is

20    under development.  It has nothing to do with the patent

21    at issue.  It's the subject of other patents.  And,

22             One other quick footnote, because this is going

23    to come up again in this discussion and this argument today.

24    As the Court is well aware, there is a companion case going

25    on in the state court in Arizona.  That is what we sometimes

1    refer to as the contract case.  In the contract case, Actavis

2    has learned various different products that Medicis has

3    under development.  It has been extremely narrow, and it has

4    been extremely tailored such that they are not permitted to

5    have some unfettered access to all of our proprietary

6    materials.

7              Part of the breach of contract case is that

8    there was a contract between these parties.  They were

9    exposed to certain confidential information.  Actavis is

10   alleged to have breached that contract; and that issue is

11   going forward in Arizona, as I said.

12             It would not be the right result to use the

13   patent case to open a door that has not been permitted in

14   the Arizona state court case to look into the proprietary

15   material that is under development.

16             THE COURT:  On the table of contents issue, I

17   mean is your position that the name itself of a proprietary

18   formulation or drug should be redacted as well if it's in

19   the table of contents?  Is that what you were saying before?

20             MR. SITZMAN:  If it describes what the proprietary

21   combination is.  Usually it doesn't give some fancy name, and

22   it doesn't say CR459, some sort of code name.  The reason for

23   the redaction in the table of contents is because what is

24   actually being described in the table of contents is the

25   actual combination of either active ingredients or the study

1    of a new formulation or a new delivery system.  We believe

2    that description alone will disclose what is under development.

3              THE COURT:  Mr. Gleason, my question for you is

4    in another context, we're having disputes about whether or

5    not, with respect to other products, how those other

6    products having similar components might or might not be

7    relevant to what is at issue in this case in a way where

8    Actavis is kind of on the other side of the issue.

9              To the extent I can understand what the kinds

10   of redactions here relate to based on the record before me,

11   how is what you think you are entitled to different than

12   what you think you don't have to produce with respect to the

13   topical gel product issue?

14             MR. GLEASON:  Your Honor, I think the difference

15   there is one of degree.  In the case of the information that

16   plaintiffs are seeking about an entirely different drug that

17   has entirely different active ingredients and just happens

18   to use similar gelling ingredient, that is an entirely

19   different drug and an entirely different product.

20             Here, what we're talking about is not entirely

21   different drugs and entirely different products.  We're

22   talking about taking the Ziana gel that is at issue in this

23   case and all they're doing is adding to it's an oil phase

24   and turning it into a Ziana cream.

25             Contrary to what Mr. Sitzman said, that is not

1    completely unrelated to the patent at issue in the case.  In

2    fact, it's discussed extensively at the patent specification

3    in the patent at issue in this case.  There was a divisional

4    at some point, so there is a separate patent which claims

5    the Ziana drug with an oil phase.  It is not unrelated, and

6    it's a misnomer to say that it is.

7            In some of these instances, if you look at the

8    patent, one of the drugs that they're talking about is

9    Clinagel.  There are extensive comparisons of Clinagel, on

10   the one hand, to a previously on the market product called

11   Cleocin on the other.

12           It looks to us like what plaintiffs have done

13   is gone through the lab notebooks and redacted in almost

14   every instance the word "Cleocin," which is incomprehensible.

15   That is clearly relevant.  There is discussions in the

16   specification about comparisons of Clinagel on the one hand

17   and Cleocin on the other.  I just don't understand how they

18   can say that is not relevant.

19           The other thing we can see here, and you can

20   see this, if you look at Notebook CL2, which I believe is

21   Exhibit IB to our letter, what Mr. Sitzman is telling you

22   is different products is actually, you know, one of the

23   products that we know is at issue is Clinagel.  The title

24   of the notebook tells you two of the other products.  One is

25   called Clindapad, which is Clinagel just applied with a pad,

1    and another product is called Clindacyl, which is closely

2    related to the products in the case.  As we've heard from

3    the testimony of their witnesses, it's a very similar drug

4    that has clindamycin and salicylic acid in it.

5              As a result, the lines that the plaintiffs are

6    having to draw are lines between projects that actually

7    bleed from one into the other.  Actavis, on the other hand,

8    it is much easier for Actavis to draw clear lines on its

9    products.

10             Again, the other thing that I would say that

11   is a basis of distinction here is Actavis, as I previously

12   mentioned, has produced the table of contents for all of

13   its notebooks.  So if there were any issue about whether

14   or not we were withholding relevant sections of our lab

15   notebooks, the plaintiffs would have raised that by now

16   because they have the information to do so.  We don't.

17             THE COURT:  Look, I think based on where we

18   are right now, it's difficult to -- I think it's impossible

19   really for me to make decisions that relate to any or all

20   matter of what may or may not be deemed redactable by the

21   plaintiffs.

22             I think the best thing I can do for now is to

23   talk about a process that at least in my mind will help us

24   get to a point where, ideally, the parties can resolve

25   these issues on their own, but if not, they'll have enough

1    information to be able to frame it for me so that I can make

2    an ultimate determination.

3            So here is what I'm going to propose going

4    forward, which is I will order that the plaintiffs produce

5    new versions, as they've said they intend to do, by

6    October 5th of the documents at issue here.  Those versions,

7    as I understand it, will likely include some amount of

8    material that is currently redacted not being redacted

9    anymore.  But my sense also is it's likely going to be the

10   case that there will still be some redacted material in

11   those documents after the plaintiffs make that production.

12           In addition, I'll order them, when they make

13   their production, to provide some description in a cover

14   letter as to the area, a general description of the reasons

15   why material has been redacted in the documents.  I won't

16   set out an appropriate level of specificity or generality

17   but some explanation so the defendant can get an understanding

18   as to why it is certain material in these books have been

19   redacted.

20           Through that process, my hope will be that the

21   parties will be able to resolve the issue as to what should

22   or what should not be produced.  If they can't, my hope is

23   that that process will at least give them the ability to

24   help kind of target for me what kinds of material is really

25   at issue and how that material relates to what is my focus

1    here, which is the patent at issue, the drug at issue, and

2    the issues at play in this case.

3              Lastly, I would say as to the table of contents

4    issue, which is probably the one that I think is best framed

5    for me, it strikes me that there should be a way to produce

6    a document that doesn't have an entirely redacted table of

7    contents page.  I can't know what these table of contents

8    truly look like, and it may be that there are some portions

9    of them, because they contain irrelevant, proprietary

10   information that would still need to be redacted, but my

11   gut tells me some portion of a table of contents of a

12   notebook should be producible.  If it was, it might give the

13   other side at least a sense as to what the contents of the

14   notebook are in a way that that doesn't compromise the.

15   Plaintiffs.

16             So that is my take going forward in terms of a

17   process going forward.  As to that issue, is there anything

18   that is unclear that the parties need clarification on?

19   Mr. Sitzman, for your side.

20             MR. SITZMAN:  No, thank you, Your Honor.

21             THE COURT:  Okay.

22             MR. SITZMAN:  I think we understand.

23             THE COURT:  Got it.

24             Mr. Gleason?

25             MR. GLEASON:  No, thank you, Your Honor.

1           THE COURT:  Let's take up the remaining issues.

2           The first that I turned to was the issue about

3  discovery as to Actavis's other topical gel products.  This

4  comes out of plaintiffs' motion and, as I understand it,

5  there are kind of two subcomponents to it.  One relates to

6  the production of certain deposition transcripts and the

7  other relates to the designation of a 30(b)(6) witness.

8           Mr. Sitzman, let me give you the opportunity to

9  argument what you wrote and lay out your position as to each

10  of those two respective issues.

11           MR. SITZMAN:  Thank you, Your Honor.  I guess I

12  wanted to take two steps back here.  There are really two

13  other products that Actavis either has in development or had

14  in development at various different stages that are what

15  we're after through these transcripts and through the 30(b)(6)

16  designee.  That is a product that the trade name is, one is

17  called Differin and the other one is called Veltin.  Both of

18  those drugs are topical aqueous acne medications, just like

19  the current medication.  And,

20           In fact, Your Honor, you heard a little bit

21  about the Differin product during claim construction.  That

22  was a case that was brought in front of Judge Stark and

23  during claim construction in that case, much like this case,

24  Actavis had requested that a viscosity limitation be adopted

25  into the claims of that patent.  And in that, one of those

1    in particular was a carbomer which is exactly what we have

2    at issue in our case.

3              In the formulations of Differin and Veltin, both

4    of those products use a polyacrylic acid polymer, Carbomer

5    940.  Carbomer 940 is a highly cross-linked polymer that is

6    specifically excluded by the patent at issue in this case.

7              For some reason, Actavis has chosen not to use

8    940 in the formulation of their current Ziana product, the

9    one that is at issue in this case.  If they had used 940, we

10   would not be having this conversation today.

11             There is some reason that they chose not to use

12   940 and instead use HGC and xanthan gum, and it relates

13   directly to what we need to show, for function way and

14   result and for the DOE doctrine of equivalents, to show

15   why they choose HGC and xanthan gum in our topical aqueous

16   acne medication and why they chose not to use a polyacrylic

17   acid polymer that was already in use in two other products

18   of theirs that they knew fell outside the patent.

19             This issue came up earlier in this case as part

20   of a motion to compel in April.  In that situation, we had

21   -- and I know that both sides have referred to it.  I know

22   that the defendants have relied on it.  We had a motion to

23   compel where the Court heard arguments in connection with

24   the very broad document request that we had originally pro-

25   pounded.  The Court made certain conclusions there in that

1    order, and I think we both have now attached it to our papers.

2              We are not seeking an order to compel compliance

3    with that order.  We cite to that order because we think it's

4    relevant and it actually frames this issue and it also shows

5    why these two discovery vehicles, the 30(b)(6) and the request

6    for the transcripts, are narrowly focused and why they're

7    relevant to this issue.

8              The defendant has refused to produce the

9    transcripts, refused to provide a 30(b)(6) witness, and

10   responded to that April 30th order in the exact same way.

11   That is, to say that unless the words "interchangeable" or

12   "substitution" appear in either the transcripts or their

13   documents or anything else like that, they're taking the

14   position that they will not produce any information, any

15   documents, any witness or any transcripts relating to these

16   other two products.

17             The testimony, turning briefly -- well, actually

18   let me just take the two individually.  So what we've requested,

19   as the Court has pointed out already, is with regard to the

20   Differin product, in that case what we've asked for is a

21   copy of three transcripts.  Those are the three 30(b)(6)

22   witnesses that have testified in our case.  They're the ones

23   who testified regarding the topics including the development

24   of the generic Ziana formula in our case.  They also testified

25   in the Galderma case where the different product was at issue.

1           We've requested to look at those so that we can

2   see what it was that they testified to and see whether or

3   not we're going to get some more information about why they

4   chose not to use this 940 polymer that clearly fell outside

5   the '383 patent.

6           THE COURT:  Just to ask you about the deposition

7   transcripts.  How does the use of a highly cross-linked

8   polyacrylic polymer like Carbomer 940 relate to the doctrine

9   of equivalents issue here which is how HGC or xanthan gum

10  is or is not similar to the polyacrylic polymer that is

11  referenced in the patent?  Make the link for me in terms of,

12  based on what we know about these depositions, what it is

13  you will find and how it relates to the DOE that is at issue

14  in our case.

15          MR. SITZMAN:  What I'm hoping to find perhaps --

16  and it is a little bit of an unknown for us, but let me

17  describe what it is that we do know.  940 does not have the

18  look and feel that the likely cross-linked polymer and that

19  HGC and xanthan gum has.  It has a much higher viscosity.

20  It has a much thicker feel to it, a much unpleasant kind

21  of application and skin feel, patients don't like it, and

22  things of that nature.

23          By being able to find out what the decision-making

24  process was for using 940 in related products, closely related

25  products will help establish the decision not to use 940 in

1    our case but to use HGC and xanthan gum to achieve what we

2    were able to achieve with the lightly cross-linked polymer,

3    namely, a very, very light viscous material that has an

4    elegant skin feel and that the patients really like.

5            We're going to hear a lot of that testimony as

6    part of this case, which is the substitution or the use of

7    HGC and xanthan gum in place of the lightly cross-linked

8    polymer achieve substantially the same results in

9    substantially the same way, and that using 940, which was

10   clearly outside the patent, would not have achieved those

11   same results because it would not have yielded those same

12   skin feel and the same viscosity and all the other same

13   results that they were after and that they were looking for

14   when they copied the Ziana formula.

15           THE COURT:  Now, the other side said these

16   deposition transcripts don't refer at all to HGC or xanthan

17   gum.  They represent that there certainly won't be discussion

18   in them of those two components.

19           MR. SITZMAN:  Right.

20           THE COURT:  So what you are hoping is there is

21   some discussion as to the experience of using Carbomer 940

22   that will shed light on why they used HGC or xanthan gum as

23   to the drug at issue in our case in a way that will help

24   understand presumably their view as to why HGC and xanthan

25   gum work in a similar way, achieve a similar result as does

1  the polyacrylic polymer that is at issue in the patent.

2          MR. SITZMAN:  Exactly, Your Honor.  I was not

3  surprised at all that there was no mention of HGC and

4  xanthan gum in those transcripts, but I bet there is a large

5  discussion of 940 and what its characteristics were and what

6  its uses were or what its viscosity was, why it was chosen,

7  all of those things, which will all be relevant to Actavis's

8  knowledge.

9          When they decided to formulate their generic

10 Ziana, they decided not to pick 940 for a reason.  The

11 transcripts from the Galderma litigation -- and I also want

12 to talk about the 30(b)(6) deponent, but the information

13 from the 30(b)(6) deponent on the Veltin formulation will be

14 relevant to understanding their choice of HGC and xanthan gum.

15         THE COURT:  Now, Veltin, the other side

16 represents, look, this was abandoned early.  There never

17 was any formulation work done.  It's not an ongoing project.

18 Therefore, there is no information that is arguably relevant.

19         What is your response to that?

20         MR. SITZMAN:  Twofold.  One is that they've not

21 produced a 30(b)(6) witness which as we know requires some

22 investigation and analysis.  They objected to that right

23 from the beginning.  They were not going to undertake any

24 review of documents.  They weren't going to educate anybody

25 on that topic.

1          We know based on the deposition of Ms. Winslow

2    that when it came down to considering a generic Veltin, they

3    did choose and they did have to consider what they already

4    had under development in terms of the generic Ziana which

5    had HGC and xanthan gum and what they would have to do for a

6    generic Veltin which was 940.

7          So in the project, the Veltin project, which may

8    not be underway today and it may have been killed and it may

9    be dead, but at one point in time, they were choosing and

10   they had discussions as to whether or not they were going to

11   formulate generic Veltin with 940 or HGC and xanthan gum,

12   and that is highly relevant to the use of xanthan gum and

13   HGC in our case.  And,

14         I don't think they've undertaken.  They objected

15   right up front to that 30(b)(6) topic; and the people they

16   produced, they made very clear on the record that they would

17   only be testifying in their 30(b)(1) capacity.  Most of them

18   said "I don't know," except for Ms. Winslow who said that

19   they, when she was presented with an e-mail, explained that

20   there was consideration and discussion as between the two

21   formulations.

22         One other point.  Actavis, I think it comes out

23   of the transcript that we attached to the document, to the

24   motion, Your Honor, Actavis was very interested in pursuing

25   a generic Veltin.  They went so far as to petition the FDA

1   to have the Veltin product listed as a second RLD, which is

2   a registered listed drug for which you can file a generic

3   against.  They petitioned the FDA for doing that because at

4   one point in time, they had a project named the generic

5   Veltin project.

6            THE COURT:  All right.  Mr. Gleason, do you want

7   to respond?  Could you just hit each of those two issues

8   separately?

9            MR. GLEASON:  Yes.  First of all, I will start

10  with the alleged Veltin project.

11           Mr. Sitzman is incorrect.  There was never

12  anything called the generic Veltin project.  There was

13  never any formulation work done on Veltin.  There was never

14  any consideration of whether to use Carbomer 940 in Veltin.

15           There were some early discussions about whether

16  or not Actavis could take the formulation that they came up

17  for Ziana and use that exact same formulation as a generic

18  for Veltin or whether Actavis would have to do something

19  else, whether Actavis would have to reformulate its product.

20           That decision was never made, the project was

21  killed, and no formulation work was done at all.  So the

22  expectation that there are documents at Actavis regarding

23  Carbomer 940 and the Veltin project, it's simply not true.

24  There is nothing to compel there.  There is no information.

25           The other thing that I am just shocked to hear

 1    Mr. Sitzman say is that Carbomer 940 is clearly outside

 2    the scope of the patent.  I mean this is from a set of

 3    plaintiffs who have asserted the '383 patent specifically

 4    against Veltin and accused it of infringing the '383 patent.

 5    It's unconceivable Mr. Sitzman in his client in one case is

 6    suing people for making Veltin and then turning around and

 7    telling you Carbomer 940 is outside the scope of the patent.

 8              In any event, with respect to Veltin, there is

 9    nothing to produce.

10              Before I move off of Veltin, Mr. Sitzman says

11    we haven't produced a 30(b)(6) who says that.  Well, we did

12    submit a letter to the Court that is signed by our counsel

13    that says there is no more information to produce on the

14    Veltin project.  I think that should close the matter.

15              With respect to the Differin project, what

16    Mr. Sitzman has not said is that the branded Differin uses

17    Carbomer 940.  Actavis's generic version of Differin also

18    uses Carbomer 940.  There was no substitution.  There was no

19    interchangeability.  There was no discussion about changing

20    that portion of the formulation.  It was simply reusing the

21    branded formulation.  So, again, the notion that these

22    deposition transcripts are going to be illustrative somehow

23    of why Actavis did not use Carbomer 940 in its generic Ziana

24    project is simply not there.

25              Moreover, they have had a 30(b)(6) on the

1    formulation of Ziana, and they've had individual deposition

2    testimonies of all of the formulators who ever worked on

3    Ziana.  If they wanted to know why Actavis didn't use

4    Carbomer 940, they should have and could have asked those

5    witnesses.  And, in fact, there is like eight pages of

6    Mr. Desai, our 30(b)(6) witness, on this topic's testimony

7    where Mr. Evall, counsel for plaintiff, is going through a

8    long list.  Why did you not use X?  Why did you not use X?

9    Why did you not use Z?  And all of that testimony is right

10    there for them.

11         There is no reason to go on a fishing expedition

12    through deposition transcripts in a completely unrelated

13    case to try to find some hint of something that they had a

14    direct witness to ask on.

15         The last thing I would say about the depositions

16    in the Differin case are that they have been marked highly

17    confidential.  They are Actavis's witness, so it stands to

18    reason that most of the confidential information in there is

19    Actavis confidential information, but we can't know whether

20    there is also Galderma confidential information in those

21    deposition transcripts.

22         At the very least, somebody needs to ask

23    Galderma if they're okay with the production of these

24    depositions.  As we pointed out in the letter, we have

25    haven't heard from the plaintiffs they have done that.  I

1   know Mr. Blumenfeld represents Galderma in that case, so

2   maybe he can resolve that for us.  Without that resolution,

3   I'm not sure that the Court can order the production of

4   these deposition transcripts.

5               THE COURT:  All right.  Let me ask him that in

6   a second.  But as to the deposition transcripts, I know you

7   have represented that -- it's not a burden issue; right?  I

8   mean these are a couple of depositions.  Your focus is on

9   lack of relevance/fishing expedition is what I'm gathering.

10  Is that right?

11              MR. GLEASON:  Yes, Your Honor.  The other

12  difficulty I have is these other depositions, already having

13  been taken, I'm not sure how these deposition transcripts,

14  even if produced, would ever be used.  They're hearsay, and

15  they would be able to come in under the hearsay exception

16  if they were used for impeachment, but I'm not sure how the

17  plaintiffs would ever be able to use these transcripts to

18  impeach any of these witnesses because it is testimony from

19  an entirely different and unrelated case.  At some level,

20  it's difficult to understand what the usefulness of these

21  transcripts would be even if they were produced.

22              THE COURT:  But focusing on content for a

23  second, can you or are you also representing -- I mean

24  you read, you reviewed the depositions, the transcripts

25  themselves.

1          MR. GLEASON:  Yes.

2          THE COURT:  To some degree, the plaintiffs, in

3  terms of explaining relevancy, are kind of guessing.  We

4  think there may be some discussion about the decision as

5  to why to use Carbomer 940 as a gelling agent in the generic

6  version of Differin, as I understand it.  Can you represent

7  that there is no such discussion about the reasons as to why

8  or why not to utilize Carbomer 940 as the gelling agent in

9  the generic version of Differin in these depositions?

10         MR. GLEASON:  Your Honor, after reviewing those

11  transcripts, my conclusion was that the reason they chose

12  to use Carbomer 940 was because that is what the branded

13  product used and not because they made some individualized

14  consideration of the characteristics and quality of Carbomer

15  940.

16         THE COURT:  Mr. Blumenfeld, can you shed any

17  light on the issue with respect to Galderma's confidentiality

18  issues?

19         MR. BLUMENFELD:  I wish I could, Your Honor, but

20  I really can't.  One reason I can't is because it was really

21  my partner, Ms. Noreika, who handled that case although my

22  name was on that.

23         THE COURT:  All right.  With respect to this

24  issue, I think I would start from the premise, going back to

25  my order which is I think cited in both parties' briefs from

1    April 30th, which was a narrow one.  The gist of it was there

2    is going to be plenty of discovery in this case.  There are

3    going to be depositions about why it is that Actavis chose

4    to use HGC and xanthan gum in this particular drug and how

5    or why that relates to the polyacrylic acid polymer that is

6    referred to in the patent.

7            I think the purpose of the order was when it

8    comes to looking to other products, it's kind of a narrow

9    band of relevance.  That you have to be able to articulate

10   in some way how it is that the decision to use a particular

11   component relates to the issues here.  The issues here that

12   were being discussed in the order were the doctrine of

13   equivalents issues.  And,

14           The end of the order, which is quoted in Actavis's

15   brief, has a pretty narrowly cabined group of documents that

16   would be deemed to be relevant enough in light of the burden

17   here.  They relate to the substitution or interchangeability

18   of HGC and xanthan gum for a polyacrylic polymer.

19           So as an initial matter, I don't think, as I

20   understand it, the types of evidence that the plaintiffs

21   hope to obtain vis-a-vis the 30(b)(6) deposition and the

22   deposition transcripts here, relate to that issue.  They

23   don't relate to the interchangeability of those things.  I

24   think they're even a further step removed, even if they

25   existed.  And, I think really the articulation of how they

1    might possibly be relevant is an attenuated one.  And,

2          So I don't think there has been enough of a

3    showing that there is a sufficient relevancy here to require

4    me to order that these deposition transcripts, leaving aside

5    the issue as to whether I could order it to be produced at

6    this stage, be produced in light of the issues at play in

7    this case.  And, similarly, with respect to the 30(b)(6)

8    deposition, not only for that issue but also in light of

9    what I think are the pretty clear statements by Actavis

10   that because the product at issue there, Veltin, was

11   terminated so early in its development, that there would

12   not be any and are not any discoverable information even

13   relating to what has been requested by the plaintiffs in

14   the possession of defendants with respect to that drug.  And,

15         Look, I think Wright & Miller, among others, in

16   Section 2213 of Wright & Miller states that:  in general, a

17   party can fulfill its discovery obligations by saying, in

18   essence, a particular document or type of documents are

19   not in existence and are not in the responding party's

20   possession, custody, or control.

21         I read Actavis's statement to amount to that.

22         So in light of all those considerations, I'm

23   going to deny the plaintiffs' request to compel the

24   production of these documents or this 30(b)(6) deposition,

25   again, primarily on not being able to establish in my mind

1   a sufficient, even arguable relevance here that goes far

2   enough to require the production.

3            With that said, the next issue that I saw was

4   whether or not a 30(b)(6) deposition could be compelled with

5   respect to the topics, and I think it's 19 to 25 that relate

6   to secondary considerations of nonobviousness.

7            Mr. Gleason, this was your motion I believe.

8   I'll let you add anything you want to with respect to it.

9            MR. GLEASON:  Sure, Your Honor.  I think I would

10   just say two things.

11            One.  We don't think that the topics that we've

12   asked are actually legal contentions.  I think if you look

13   at our topics, what we're asking is for the facts related to

14   the commercial success of the invention.  That is not a

15   legal contention, that is a fact.  We're seeking a 30(b)(6)

16   on whether the invention achieved unexpected results.

17   Again, that is not a legal contention, that is a question

18   of fact.  I think that is very different than the way that

19   some of the 30(b)(6) topics were phrased in some of the

20   transcripts that the plaintiffs had provided.  The wording

21   of the topic does matter.  And,

22            We didn't ask for, you know, a 30(b)(6) on your

23   contentions as to secondary considerations.  We broke it

24   down and asked for, we broke it down to a level of factual

25   matters.  So we think that our topics are appropriate and

1   that the plaintiff should have to produce a witness on those

2   topics.

3           The other thing I would say is that the

4   plaintiffs are saying, look, this is more appropriate for

5   contention interrogatories.  That's great that they're

6   saying that now, but we served a contention interrogatory

7   that asks for their response to our invalidity contentions.

8   It's our Interrogatory No. 6.  And,

9           The current response that we have from them is

10  dated April of this year.  It makes broad generic statements

11  about secondary considerations of nonobviousness, but it

12  doesn't set forth any of the facts on which they would base

13  their secondary considerations.

14          On the one hand, we have the plaintiffs telling

15  you that, look, this is really better for contention interrog-

16  atories, but what they're telling us effectively is you're

17  not getting it through contention interrogatories either.

18  At the same time, the plaintiffs are telling us they are

19  reserving the right to call fact and expert witnesses at

20  trial to say whatever it is they want on secondary consider-

21  ations without having to disclose that to us first.  And,

22          I think that we have a fundamental problem

23  with that.  There has to be some solution here where the

24  plaintiffs have to put their facts on the table as to what

25  those secondary considerations are.  Then we get to do some

1    follow-up deposition testimony on that.  And, then we can

2    have an informed discussion through expert reports and

3    summary judgment and things like that about the import of

4    the secondary considerations.

5              THE COURT:  Can I ask you?  They're running

6    together in my mind now.  Did the sufficiency of their

7    responses to your secondary considerations contention

8    interrogatories, has that come up before in one of our

9    discovery disputes?

10             MR. GLEASON:  Your Honor, that was -- I believe

11   what happened is we had moved on -- I'm trying to -- I know

12   that we moved on Interrogatory No. 7.  We did not move on

13   Interrogatory No. 6.  I think the reason is that shortly

14   before the teleconference that was scheduled where we

15   discussed Interrogatory No. 7, which was the doctrine of

16   equivalents contentions, the plaintiffs agreed to provide

17   us a supplement on Interrogatory No. 6.

18             We got that supplement, and it discussed the

19   references and says this reference is missing this limitation

20   and this reference wouldn't be combined with that reference,

21   but there is sort of a catchall paragraph at the end that

22   discusses secondary considerations that are really, really

23   broad level and doesn't give any facts or details or

24   information.

25             THE COURT:  Okay.

1          MR. GLEASON:  I think the answer to your

2    question is that this specific interrogatory has not been

3    presented to Your Honor.

4          THE COURT:  If the plaintiffs -- I don't know

5    that they would, but if they offered to supplement their

6    responses to Interrogatory No. 6 prior to the close of

7    discovery in some way, would that go some way towards the

8    gist of what you would otherwise be hoping to get out of a

9    30(b)(6) deposition on these topics?

10          MR. GLEASON:  Yes, it would.  Frankly, if we got

11    a written explanation of their contentions as to secondary

12    considerations and then had the opportunity to depose people

13    who had the relevant facts, that would I think satisfy us.

14          That is I think what you see in the *Pharmacia*

15    case that the plaintiffs rely on where the Court says,

16    okay, fine.  Treat these 30(b)(6) topics as if they are

17    interrogatories, provide answers that way, and then there

18    can be follow-up fact depositions discussing those.

19          We would be happy to agree to a procedure like

20    that, again, whether the answer comes in the form of a

21    supplemental response to Interrogatory No. 6 or whether

22    the 30(b)(6) topics that are at issue now are treated at

23    interrogatories.

24          I will note that Actavis has not served anywhere

25    near the full limit of its number of interrogatories, so the

 1   Court could convert those to interrogatories without having

 2   to worry about the numerical limitation issue.

 3                THE COURT:  Mr. Sitzman, the other side, what

 4   they are getting at I think ultimately is a mechanism to

 5   obtain more detail with regard to secondary considerations.

 6   I'll certainly let you respond to what Mr. Gleason said.

 7   Can you see any middle ground here is my question?

 8                MR. SITZMAN:  I guess let me respond or react

 9   first, and I guess I will have to table some other thoughts,

10   I guess, and think about that middle ground.  But let me

11   just back up.

12                There was no challenge to validity in this case

13   for almost a year that this case was pending.  Actavis,

14   when it served its Paragraph IV notice, did not include any

15   grounds or any allegations that this patent was invalid.

16   Never once did it assert invalidity; and it was not until

17   we got interrogatory responses that we saw any invalidity

18   challenge whatsoever.  It did counterclaim for declaratory

19   relief.  Never did we ever see any grounds.  The Paragraph

20   IV letter is completely empty.

21                When they propounded Interrogatory No. 6 which

22   relates to this, they never asked for secondary considerations.

23   It's just not there.  They suggest that we should explain why

24   it's not invalid under 103, but they've never even set forth

25   a 103 argument at that point in time.

1          The fact is that while discovery was undergoing

2     in this case, there was no articulation certainly by the

3     defendant of an obviousness challenge under 103 that would

4     require secondary considerations, No. 1, or an interrogatory

5     that requested secondary considerations.  That was my

6     reaction.

7          I want to respond briefly.  These topics are

8     clearly contention topics.  Requiring a layperson, that we

9     would have to designate, to formulate the full extent of

10    the contention, whether it be fact or not, requires a legal

11    analysis and requires that layperson to have all of the

12    facts related to the trial strategy and the formulation and

13    the art, articulation of all the different components that

14    make up unmet need and unexpected results and teaching away

15    and all of those things.

16         Keep in mind as you heard from Mr. Gleason

17    earlier, this is a patent that resulted not only in the

18    product that we make but in two other products as well.

19    Therefore, all of these secondary considerations would also

20    have to apply to all of those products as well.  Requiring a

21    layperson to have all of that knowledge while they sit in a

22    deposition is exactly why this District does not allow these

23    kind of contention topics for 30(b)(6) witnesses.

24         THE COURT:  No, you set that out well in your

25    brief.  Let's assume I agree with you that there is that

1    clear line of case law, and that one of the reasons for it,

2    quite frankly, is that when you have 30(b)(6) deposition

3    topics that read like contention interrogatories regarding

4    secondary considerations, it is not only because of the

5    administrative inefficiency issue that you raise with

6    respect to preparing a witness on those topics but the

7    courts have also noted that, hey, you can get this

8    information through contention interrogatories.

9         My sense is it's easier for a plaintiff like you

10   to respond by saying, hey, we've provided that information.

11   These are our responses to the contention interrogatories.

12   So that is why we have this whole policy in the first place

13   that Judge Farnan and Judge Jordan are noting.

14        So then that just begs the question:  To the

15   extent at some point the defendant has made, put forward

16   contention interrogatories regarding secondary considerations,

17   what is the scope and current status of your response?  And,

18   relatedly, to the extent that it is kind of more general,

19   would you have a willingness or be willing to supplement it?

20        MR. SITZMAN:  So let me take those in two parts.

21        No. 1, I think the Court reviewed Interrogatory

22   No. 6.  I think it would be fair to say that what the

23   defendant would have to do is ask for leave to propound a

24   new interrogatory.  The discovery period obviously has been

25   extended, and I don't think that would be much of an issue.

1          The second piece of that is, I guess to answer

2     your question, if the defendant were to propound a new inter-

3     rogatory requesting details on our secondary considerations,

4     then we would certainly respond.

5          I think, however, and I just want to note, I

6     am concerned at this late date what that means in terms of

7     expert reports and further depositions and keeping this

8     discovery period going and going and going.  I don't think

9     the Court wants to do that.  I know the parties should not

10    want to do that.  So I would like some guidance there.

11         But in answer to the short question that you

12    have, with the Court's permission, which I hear coming, if

13    the defendant was to propound a contention interrogatory on

14    secondary considerations, the plaintiffs would respond and

15    provide as much detail as it can at this point.

16         THE COURT:  So there is not currently a

17    contention interrogatory that has been propounded that

18    covers this ground in your view?

19         MR. SITZMAN:  In my view, no.

20         THE COURT:  That you would be required to

21    supplement, you know, were such detail -- in other words, to

22    get around the procedural hurdle of defendants propounding

23    new contention interrogatories at this stage.

24         MR. SITZMAN:  I think if the Court were to

25    broadly read Interrogatory No. 6, which asks for, in light

1    of the prior art previously identified by Actavis, why the

2    patents are not invalid; if the Court were to broadly

3    construe that as including not only a response to the prior

4    art but also to every secondary consideration, then we would

5    respond to that.

6            There is not an interrogatory out there in my

7    mind that says:  Please identify any secondary indicia of

8    nonobviousness and/or your basis for contending that there

9    are secondary bases.

10           THE COURT:  Okay.  I'm dealing with the issue I

11   have before me, which is whether or not Actavis should be

12   able to obtain a 30(b)(6) deponent with respect to topics 19

13   to 25.  That is the topics that really I think describe,

14   request information regarding secondary considerations.

15           I think that the plaintiffs are correct that

16   our District, in cases like the cases that they have cited

17   in their briefs, including *Reliant* and *Pharmacia* and others,

18   have identified a clear view of the Court here that so-called

19   contention depositions are not favored.

20           My sense is from reading those cases, that is for

21   Two primary reasons in the context of a 30(b)(6) deposition.

22           One is to the extent the topics in issue really

23   read more like requests for additional legal contentions as

24   opposed to underlying factual evidence regarding these issues.

25   The best way and the most appropriate way to respond to that

1    is by responding to contention interrogatories that ask for the

2    same thing.  And,

3              Secondly, I think it's something Mr. Sitzman

4    said, which is I think there is a general view in the

5    context of a 30(b)(6) deposition, it is particularly

6    inefficient, especially if you have the ability to propound

7    contention interrogatories, to require in this case the

8    plaintiffs to prepare a 30(b)(6) witness who may not them-

9    selves have that information in their own knowledge base to

10   testify as to these issues.

11             In light of that guidance from the case law,

12   also in light of the fact as I read the topics, I disagree

13   with Mr. Gleason, I think that they really do read more,

14   they read as give me your legal position as to these issues,

15   and they read more that way than they do as a request for

16   some targeted specific fact issue that might in some way

17   otherwise relate to secondary considerations of nonobviousness.

18             So for all those reasons, I'm going to deny

19   Actavis's request to require the plaintiffs to put forward a

20   30(b)(6) witness as to these topics.

21             Look, I don't know what form it will or won't

22   come in, but I'll tell you that some of the basis for that

23   is, as I have said, based on the idea that this information

24   is more promptly obtained via contention interrogatories.

25   Our discovery period isn't complete.  It strikes me that in

1    some way, shape or form, it wouldn't be inappropriate for

2    the plaintiffs to either supplement or to provide some

3    amount of this information via the response to a contention

4    interrogatory.  I think that is the impetus for this general

5    rule that we have anyway.  So I will say that.

6              That is not before me.  What is before me is the

7    request for the 30(b)(6) deponent.  I'm going to deny that

8    request.

9              Lastly, I think we have the issue of witness

10   testimony and deposition testimony that Actavis has requested.

11             Mr. Gleason, do you want to make any additional

12   brief argument with respect to that issue?

13             MR. GLEASON:  Your Honor, I think the parties

14   are fairly close on this one.

15             There are four of the seven witnesses that have

16   been deposed.  As indicated, they previously had been

17   deposed in the contract case.

18             We're happy to accept the transcripts and

19   exhibits from that case.  What we can't have is the plaintiffs

20   reserving the rights to redact whatever they want from those

21   transcripts before they produce them to us.

22             Frankly, the redaction is a little bit silly

23   because we are counsel for Actavis in the contract case, so

24   we already have those depositions in front of us, so really

25   the only person who learns anything new by the fact of these

1    depositions being deemed usable in this case is you, Your

2    Honor.  I don't think there is any reason to redact these

3    transcripts in any way from you.

4         We don't have the same sort of proprietary trade

5    secret information that was at issue with the previous

6    redactions because Actavis counsel at least already knows

7    all of this information.  If we can get unredacted transcripts

8    and exhibits from those four deponents, that I think would

9    resolve the issue.

10         THE COURT:  Can you just speak to -- I mean

11    forget the issue of timeliness for a second.  But just in

12    terms of seven witnesses, who were designated, I mean what

13    information are you trying to get out of these witnesses?

14    And to the extent the other side argues about the cumulative

15    nature of the request, can you shed some light on to why

16    seven, and why you made that request?

17         MR. GLEASON:  Sure.  The reason the request was

18    made, Your Honor, was because there is a lot of information

19    we need to know about the branded product that is at issue

20    in the case.  Frankly, we think that secondary considerations

21    are going to be a very big issue in this case.  We need to

22    know about the commercial success of Ziana.

23         We think we have useful testimony from the

24    transcripts that have already been taken.  We want to depose

25    two more people, one of whom plaintiffs have identified in

1    their initial disclosures and another of whom as I understand

2    it is the brand manager for Ziana.  I think the reason we

3    want to depose the person who is on their initial disclosures

4    is obvious.  We want to know what they want to say at trial.

5    And the reason we want to depose the brand manager is

6    because we want to know not only how much Ziana is selling

7    but why, and who is buying it, and why are they choosing

8    Ziana over other drugs, all of which we think will be

9    relevant to, at the very least, secondary considerations.

10            THE COURT:  If the transcript issue can solve

11   the problem as to the first four, and we're talking really

12   about the last three, there I understand the dispute to

13   be you have proposed, look, we'll depose Justin Smith and

14   Nathan Mitchell.  And the other side said, well, you have

15   declined to explain why depositions of both of these

16   individuals was not duplicative.

17            I'm not saying it's your burden to do so, but can

18   you give me a sense as to why those two particular individuals

19   are people you think may have relevant information who you

20   have requested to depose?

21            MR. GLEASON:  Yes.  The reason we want to depose

22   Justin Smith, Your Honor, is because the plaintiffs have put

23   him on their initial disclosures list, and we think he is

24   likely to testify at trial, and we think we are entitled to

25   know during the course of discovery what he is going to say

1    at trial.  We frankly expect he is going to testify about,

2    you know, sales numbers for Ziana and things like that, but

3    we want to make sure that that is the case and make sure

4    that we understand what his testimony is going to be so

5    we're not seeing it for the first time at trial.

6              The other gentleman, Nathan Mitchell, he is the

7    one I understand is the brand manager for Ziana.  As I

8    mentioned, I think what we're hoping is the testimony he

9    will provide is to be able to go beyond the numbers a little

10   bit and, you know, issues that are more relevant to the

11   nexus question, whether all these sales of Ziana are related

12   to the patented invention and really why, you know, how is

13   Ziana marketed.  At one point, we understand it was sort of

14   rebranded as a product that is really, you know, it's only

15   a mild irritant.  So people who have sensitive skin should

16   use Ziana.  We want to explore that a little bit because,

17   frankly, we think that is related to these issues of the

18   elegance, purported elegant skin feel and things like that.

19             So, frankly, we think we need to depose

20   Mr. Smith to figure out what he is going to testify at

21   trial, and we think we need to depose Mr. Mitchell so we can

22   understand a little bit of the why on these sales numbers.

23             THE COURT:  Mr. Sitzman, let's assume I'm

24   thinking of this as with respect to the four individuals,

25   that there has been a path proposed through which these

1    folks would not necessarily have to testify but that

2    transcripts could be provided.  I assume that is preferable

3    from your sense.  There, the issue comes down I guess to

4    just what you mean by the redactions that you reference in

5    your letter.

6              Can you speak to that?

7              MR. SITZMAN:  Yes, Your Honor.  First, I

8    think it's important, the seven together, in terms of the

9    individuals, you know, we're looking at the forecasting

10   valuation.  One person, Justin Smith is marketing.  Then we

11   have the product manager, sales, sales and marketing, then

12   we have the president of the company.

13             To the extent that any of this is relevant to

14   this case, it all relates to one subject matter which is

15   commercial success.  There is no technical information.

16   They have no information about the patent.  They have no

17   information about the doctrine of equivalents.  They have

18   no information related to any of those sources.

19             We're talking about seven depositions between

20   four transcripts and three depositions, all cumulative of

21   the exact same subject matter.  I have not read those four

22   transcripts.  I have not had access to it.

23             Actavis is counsel in both cases.  Actavis has

24   made clear in the Arizona case that they do not want, and

25   they will not permit, anything that is discovered in the

1    patent case to be used in the contract case.  For some

2    reason, I'm hearing that they know what is going on in

3    the contract case and so they want to bring that in, in our

4    case.

5            I have not had access to those transcripts.

6    I've got them now.  I'm going to read them.  I don't know

7    what they say, but it seems to me that the contract case and

8    pages and pages of discussions that is wholly irrelevant to

9    anything having to do with our patent case just seems to be

10   something that just should not be cluttering our record in

11   our case.

12           Now, I will tell you this.  If it's irrelevant

13   subject matter that otherwise get to a 30(b)(1) deposition,

14   I'm not going to have any problem with that.  I just want

15   the opportunity to read them to see what is in there before

16   I wholesale say, yes, they can all come in, and then we'll

17   deal with the evidentiary objections later when we get to

18   trial.  I just want that opportunity.

19           THE COURT:  Okay.

20           MR. SITZMAN:  Then when it comes to the three

21   remaining individuals, it's still this cumulative question

22   that I have in my mind, which is if they're going to get

23   four deposition transcripts from people talking about

24   forecasting valuations, sales and everything else like that,

25   why do we now have to have three more live witnesses or two,

1    for that matter, on the exact same subject matter?  And,

2            Candidly, Your Honor, I have to admit this timing

3    issue still kind of burns.  If these were so important, and

4    they were so critical, why, over 11 months of this case, were

5    no deposition notices were served?  And why, the day before

6    discovery, did I get seven of them?

7            THE COURT:  Is it true that both sides agreed to

8    push depositions back to August 31st such that theoretically

9    a notice served on the 16th wouldn't be on the 11th hour

10   with respect to the scheduling a depo?

11           MR. SITZMAN:  Part of that is true.  We did that

12   so that we could accommodate all the depositions that were

13   out there.  We didn't have those seven in hand when that

14   agreement was struck.

15           But let's say Mr. Gleason had a different

16   belief, which I think he throws in his letter there.  Three

17   of the four were noticed for September 11th, September 5th,

18   September 7th, knowing that there is no way that they could

19   have been scheduled in that time frame in any event.

20           THE COURT:  Lastly, can you represent that you

21   are going to produce some version of these deposition

22   transcripts by a date certain?

23           MR. SITZMAN:  Yes.  It's funny, we just divided

24   them up.  Although I am waiting for one, it doesn't appear

25   that the Vince Ippolito transcript has been received by the

1    attorneys representing Medicis in that case so we don't have

2    that one yet.  So I've got three of the four that we're

3    reading right now.  And I would expect to produce them

4    probably by October 5th, if that is sufficient enough for

5    the Court.

6            THE COURT:  First, I break these things up

7    into kind of two sets in my mind in light of the -- and I

8    appreciate the parties coming to some sort of resolution as

9    to this issue, which has been helpful to me in view of the

10   respective importance of the depositions.

11           First, let me take the non-transcript potential

12   deponents.  That is, look, I think Rule 26(b)(2) sets out

13   how it is that one could seek a limit on discovery as unduly

14   cumulative.  And I think the case law sets out that it's the

15   party objecting to that discovery that has the burden to

16   show why a particular discovery request is improper.

17           With respect to the deponents that Actavis has

18   countered with in their proposal for compromise, Justin

19   Smith and Nathan Mitchell, I think it's plaintiffs' burden

20   to show why those depositions would be unduly cumulative.  I

21   don't know that they met that burden and, moreover, I think

22   Mr. Gleason's description today on the call as to the

23   reasons why they're seeking to depose those individuals and

24   the knowledge and information they have as they relate to

25   this case suggest to me that they may be particularly relevant.

1          So I'm going to order that plaintiffs produce

2    both Justin Smith and Nathan Mitchell for deposition prior

3    to the close of discovery.

4          In addition, I'll order that plaintiffs produce

5    a copy of the transcript of the four individuals who

6    testified in the Arizona contract case by October 5th.

7          Sitting here, I can't know what, if any,

8    information will be redacted.  Frankly, I can't tell what

9    the prejudice would be as to this case if a truly unrelated

10   material was redacted.  For now, the best step I can take

11   is to require that they be produced and be produced by

12   October 5th, giving the plaintiff the ability to make

13   redactions if they think they're absolutely necessary, and

14   then take things from there.

15         Those are my rulings with respect to these

16   deposition issues which I think covers all the issues that

17   we have before us today.  Is there anything about what I

18   have said as to the last three issues that I covered that

19   is unclear, that needs clarification from the plaintiffs'

20   perspective?

21         MR. SITZMAN:  No, Your Honor.  I think that is

22   very clear.  Thank you.

23         THE COURT:  Mr. Gleason, from your perspective

24   for the defendant?

25         MR. GLEASON:  No, Your Honor.  We understand.

1              THE COURT:  All right.  Thank you for hanging in

2      there on this call.  I wish you all a very good weekend.

3              MR. SITZMAN:  I'm sorry, Your Honor.  It's Mike

4      Sitzman.  I didn't mean to interrupt because I was looking

5      forward to the good weekend as well.

6              THE COURT:  I spoke too soon.  I'm sorry.

7              MR. SITZMAN:  There is one more issue that we

8      tabled for today which is a check in on whether or not we're

9      going to proceed with the mediation on November 13th.

10             THE COURT:  Oh.

11             MR. SITZMAN:  Actavis said that they would get

12     back to us at this time.

13             THE COURT:  Mr. Gleason?

14             MR. GLEASON:  Your Honor, I think the answer is

15     yes.

16             THE COURT:  Oh.  You do want to proceed?

17             MR. GLEASON:  Yes.

18             THE COURT:  Okay.  Thanks for reminding me,

19     Mr. Sitzman.  Is that scheduled for, is it October 13th?

20             MR. BLUMENFELD:  November 13th.

21             A VOICE:  November, yes.

22             THE COURT:  Just remind me, has there been an

23     order issued with respect to mediation statements and the

24     mediation yet?  Or have I not issued that order because

25     we were waiting to figure out whether we were going to go

1    forward with that date?

2              MR. SITZMAN:  I think we were waiting to see if

3    we were going to go forward with that date, Your Honor.

4              THE COURT:  So what I will do, in light of where

5    we stand in the case and both sides' representations that

6    they feel mediation would be productive, I will issue an

7    order with respect to mediation setting out the date by

8    which mediation statements will be due, and I'll do that by

9    the beginning of next week.  I will plan on that mediation.

10             I would say I don't know to what extent the

11   parties have had substantive discussions about settlement.

12   I know there has been a lot of focus on the litigation

13   process, and so to the extent that the answer to that is

14   very little or almost none, I won't require it but I will

15   tell you it would be very productive for the sides to at

16   least have at least one or more substantive conversations

17   about that prior to submitting their mediation statements

18   just so that they can have a sense as to where both sides

19   stand and work from there in terms of preparing those

20   statements.

21             With that said, then I will look forward

22   probably to seeing you next in person at the mediation.

23   I'll look forward to talking to you then, if not before.

24   Thanks, everyone.

25                  (The attorneys respond, "Thank you, your

1    Honor.")

2              THE COURT:  Have a great weekend.  Good-bye.

3              (Telephone conference ends at 4:29 p.m.)

4

5         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

6

7                        /s/ Brian P. Gaffigan
                        Official Court Reporter
8                        U.S. District Court

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25